IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FLOYD G. ALLEN, JR,

   *Plaintiff*,

   v.

DORCHESTER COUNTY,
MARYLAND,

   *Defendant*.

Civil Action No. ELH-11-01936

## MEMORANDUM OPINION

Plaintiff Floyd Allen, an African-American, was suspended and demoted by his employer, defendant Dorchester County, Maryland ("County"), after the County determined that Allen had misappropriated and sold County property. Thereafter, Allen filed suit against the County,[1] alleging that the County imposed harsher punishment on him than it had on Caucasian employees who had committed comparable transgressions, in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000e *et seq.*; the Fourteenth Amendment to the United States Constitution; and the laws of Maryland. At the close of discovery, the County filed a motion for summary judgment (ECF 55), specifically addressing plaintiff's federal claims (the "Motion"). The Motion is supported by a memorandum of law

---

[1] Plaintiff originally filed suit in the Circuit Court for Dorchester County, Maryland against the Dorchester County Council, the Dorchester County Highway Division, and Jane Baynard, the Dorchester County Manager. *See* ECF 2. Those defendants removed the case to federal court pursuant to 28 U.S.C. § 1441. ECF 1. Plaintiff subsequently filed an Amended Complaint (ECF 20) naming the County as the only defendant. Plaintiff's Second Amended Complaint (ECF 23) is the operative complaint. Hereafter, all references to the "Complaint" are to the Second Amended Complaint, unless otherwise stated.

("Memo," ECF 55-3) and voluminous exhibits.[2]  Plaintiff filed an opposition ("Opposition" or "Opp.," ECF 60), also supported by exhibits,[3] and defendant replied ("Reply," ECF 61).  No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion.

**Factual Summary**

A.  Plaintiff's Employment History

On April 28, 1988, Allen was hired by the Roads Board for Dorchester County (the "Roads Board" or "Roads"), to work as a part-time Motor Equipment Operator ("MEO") I.  *See* Affidavit of Jane Baynard, County Manager for Dorchester County ("Baynard Aff.," ECF 55-4) ¶ 2.  He became a full-time employee on October 31, 1988.  *Id.*  In 1990, Allen was "transferred to the County Landfill" and given a "one grade salary upgrade."  *Id.*  Upon rejoining the Roads Board in 1996, Allen received another "one grade salary upgrade."  *Id.*   In 1998, Allen was reclassified as an MEO III and, in 2006, he was reclassified as an MEO IV.  *Id.*  However, in 2008 Allen was demoted to an MEO III for disciplinary reasons.  *Id.* ¶ 3.  This demotion, along with other discipline imposed at the time, gave rise to this lawsuit.

B.  The County Roads Board

Jane Baynard was appointed as the County Manager in 1999 and has held that position at all relevant times.  *See* Deposition of Jane Baynard ("Baynard Dep.," ECF 55-26) at 8:13–15. As County Manager, she "oversee[s] the day to day of the various departments within Dorchester

---

[2] The Court denied as premature an earlier motion for summary judgment filed by the County prior to the close of discovery.  *See* ECF 30, 41.

[3] The record contains two affidavits from Allen.  Plaintiff submitted his first affidavit ("First Affidavit" or "Allen Aff. 1") with his opposition to defendant's pre-discovery summary judgment motion.  *See* ECF 34-1.  Allen's second affidavit ("Second Affidavit" or "Allen Aff. 2"), was submitted with his Opposition to the Motion.  *See* ECF 60-4.

County government and to act as liaison between the department heads and the county counsel [sic]." *Id.* at 9:16–19.

Baynard has explained that, until 2002, the Roads Board was governed by Chapter 40 of the Dorchester County Code (the "County Code"). *See* Baynard Aff. ¶ 6; ECF 55-6. Under the County Code, the Roads Board was "possessed of all the powers and authority the County Commissioners possess with respect to roads and bridges in the county . . . ." County Code, Art 1, § 40-1; Baynard Aff. ¶ 6. The County Roads Engineer, who was appointed by the County Commissioners, *id.* § 40-5, headed the Roads Board. County Code, Art. 1 § 50-6; Baynard Aff. ¶ 6. At the relevant time, Elvin Thomas was the County Roads Engineer. *See, e.g.*, Suspension Memorandum, ECF 55-14. Under the County Code, the County Roads Engineer was vested with exclusive authority over County Roads employees, including the power to discipline them. It stated: "Every county employee engaged in the construction or maintenance of county roads shall be under the exclusive jurisdiction and control of the County Roads Engineer . . . ." County Code, Art. 1 § 40-7a; *See* Baynard Aff. ¶ 6. Additionally, the County Code provided that any employee with a "complaint or grievance concerning the terms, conditions or procedures of his employment may take the complaint to the County Roads Engineer," who "shall consider the complaint and answer promptly." County Code, Art. 1 § 40-7e. The County Roads Engineer was required to "keep the County Roads Board informed generally concerning all complaints and their answers." *Id.*

In 2002, "the Dorchester County Charter became effective, rendering the commissioner form of government obsolete." Baynard Aff. ¶ 6. However, "[a]s a matter of practice, prior to July 1, 2005, the County Commissioners [and subsequently, the County Council], were not

involved in the discipline decisions" affecting Roads Board employees. *Id.* ¶ 7. Rather, until July 1, 2005, the County Roads Engineer retained control over Roads Board employees. *Id.* Thereafter, the County Council "assumed control over all personnel aspects . . . including the imposition of discipline . . . ." *Id.*

C.  The Ditch Spoil Incident[4]

In March 2008, Jay L. Newcomb, a member of the County Council, informed Baynard that constituents from his district had called to complain about a County employee selling "ditch spoil" in the Madison area of Dorchester County. *See* Baynard Aff. ¶ 8. "Ditch spoil" refers to the topmost layer of earth that is removed from the ground when the County performs roadside ditching. *See* Deposition of Gary C. Phillips, Sr., former County Highway Maintenance Supervisor ("Phillips Dep.," ECF 55-27) at 40–41. Because ditch spoil is situated at the top of the ground, it contains salt, bottles, cans, and other trash that need to be removed before it can be reused. *Id.* at 41–42. By contrast, "topsoil" refers to "clean dirt," which sits just below the ditch spoil, and is more desirable. *Id.* at 41. As a matter of course, the County would offer any ditch spoil to the property owner whose property abuts the ditch, but it would stockpile topsoil to use at a later date. *Id.* at 40.

Baynard and County Human Resources Manager Becky Dennis visited the Madison area to investigate the complaint relayed to Baynard by Newcomb. Baynard Aff. ¶ 8. According to Baynard, she and Dennis observed piles of ditch spoil on several roads and were informed by two property owners that they had paid cash to an employee for ditch spoil. The first paid $1,200 for 60 loads and the second paid $20 for one load. *Id.*; *see* Investigation Summary, ECF

---

[4] In addressing various incidents alleged by plaintiff in support of his Title VII claim, I will set forth the parties' contentions and then address the facts as shown by the submissions of the parties.

55-8 at 2–3. A third property owner, Betty Miller, sought to purchase 20 loads of ditch spoil, with payment by check. She was instructed by the seller to make the check payable to "Sandy Allen." *Id.*; *see* Investigation Summary at 1.

Sandy Allen is Floyd Allen's spouse. Baynard Aff. ¶ 8. And, "[t]he instruction came to the property owner during a telephone call placed from 443 477 7477, which was determined to be Mr. Allen's cell phone number." *Id.*; *see* Investigation Summary at 1. Miller received the ditch spoil but did not write the check to Ms. Allen. Baynard Aff. ¶ 8; *see* Investigation Summary at 1. Baynard also averred that two others "agreed to accept dirt but did not pay for it," and that Phillips learned of another incident in which Allen received $420 for ditch spoil. Baynard Aff. ¶ 8; *see* Investigation Summary at 4.

After conducting this investigation, Baynard concluded that Allen was the employee who had been selling ditch spoil to County residents. Baynard Aff. ¶ 9. On April 1, 2008, Baynard, Dennis, and Robert Tenanty, Director of the Department of Public Works, met with Allen. *Id.* ¶ 10. According to Baynard, Allen at first denied that he asked anyone for money to deliver dirt to their property. *Id.* When pressed, Allen claimed that he had never asked for money, but admitted that he had on one occasion accepted money as a tip. *Id.* Baynard informed Allen that the matter would be investigated and that a hearing would be held before the County Council. *Id.* She also informed him that discipline up to and including termination could be imposed against him and that a criminal investigation might result. *Id.* Pending the hearing before the County Council, Allen was suspended, with pay, on April 1, 2008. *Id.* ¶ 11.

The County Council held a hearing on April 15, 2008, *id.*, at which Baynard presented her findings. *Id.* ¶ 12. Allen was permitted to speak in his own defense, *id.*, and he briefly

described his twenty years of employment. ECF 55-7.[5] He also claimed that, several years earlier, a Caucasian employee, Mark Elliott, had been caught selling dirt on Swan Harbor Road, but had only been suspended and was now a foreman in his department. *Id.* Allen also raised a number of other incidents of alleged misconduct by County Roads employees, and he claimed that he was "only doing what he was taught." *Id.* Allen admitted that he had accepted money for ditch spoil, but denied the specific allegations from the property owners. *Id.*; Baynard Aff. ¶ 17.

After the hearing, the County Council voted to suspend Allen for 30 days, without pay, effective April 17, 2008, and to reclassify him as an MEO III upon his return to paid employment on May 19, 2008. Baynard Aff. ¶ 17.[6] Allen was also placed on probation for six months, with the understanding that at the end of that period the Roads Supervisor and the Director of Public Works would meet with the County Council to assess whether Allen should be reclassified as an MEO IV. *Id.*

On October 9, 2008, Allen filed a charge of discrimination with the United States Equal Employment Commission ("EEOC"), Baltimore Field Office. EEOC Complaint, ECF 34-1. In his charge, Allen alleged that the County targeted him because he is a minority and that the County turned "a blind eye to investigating and disciplining many of the County's white male employees for similar or worse misconduct . . . ." *Id.* at 2.

According to Baynard, on two occasions during Allen's probationary period he indicated to Roy Mills, Highway Division Manager, that he did not wish to operate the Gradall Excavator.

_____

[5] ECF 55-7 is an audio recording of the April 15, 2008 hearing before the County Council.

[6] Allen continues to dispute several of the County Council's findings, including the amount of money he received for the ditch spoil he delivered to private residents. *See, e.g.*, Opp. at 11–12. However, the relevant question in this case is whether the discipline the County imposed upon Allen was racially discriminatory.

*Id.* ¶ 18. Plaintiff denies that he has ever "refused to operate any piece of County equipment during [his] employment with Dorchester County." Allen Aff. 1 ¶ 10. On another occasion, Allen left a County truck unattended with its keys still in the ignition. *Id.* According to Baynard, Allen left the truck in the travel lanes of the roadway without attaching reflective safety triangles to the vehicle. *Id.* Allen admitted that he left the keys in the truck, but explained that he left it "on the side of the road due to mechanical failure and the truck would not start or be moved." Further, he explained that he "could not place reflective safety triangles at the scene as none were available in the truck for him to utilize." Allen Aff. 2 ¶ 3. Citing these incidents, the County Council declined to reclassify Allen as a MEO IV when his probationary period ended on November 19, 2008. *Id.*

In September 2009, Allen filed an "umbrella type" grievance with Public Works Director Chuck Weber. Baynard Aff. ¶ 19. Weber found "no evidence" of discrimination against Allen. *Id.* ¶ 20. Allen then appealed to the County Council, which heard his grievances on September 29, 2009. *Id.* It concluded that there had been no discrimination. *Id.*; *see also* Decision Letter, ECF 55-19.

On September 22, 2010, the EEOC issued a probable cause determination finding that "there is a reasonable cause to believe that [Dorchester County] discriminated against [Allen] because of his race by suspending and then demoting him, while not following the same practices for white employees." EEOC Decision, Ex. B to ECF 34-1.[7] After receiving the probable cause determination, Allen filed this suit.

---

[7] Plaintiff argues that the EEOC's probable cause determination is "highly probative" and that it "creates a genuine dispute of material fact as to the presence of racial discrimination." Opp. at 24. However, this Court reviews claims of discrimination under Title VII de novo, and thus is not required to accord weight to the EEOC's determination. *See Laber v. Harvey*, 438

D.  The Comparators

In support of his claim that he was discriminated against on the basis of race, Allen alleges several incidents in which Caucasian employees were punished less severely for misconduct similar to his own.  Plaintiff's descriptions of the incidents differ considerably from the County's descriptions.  Below, I outline the parties' competing descriptions of the events, and I then describe the evidence presented by the parties.[8]

1.  "Fuel Tank" Incident

Plaintiff alleges that "Scott Foxwell and Tommy Niblett, both Caucasian employees, in or about the year 2000, were found to have stolen County fuel and a fuel tank," Opp. at 13, but were only suspended for three days and were not demoted.  *Id.*  Plaintiff does not offer any evidence on the topic, but rather claims that the County has admitted this occurrence in its exhibits and filings.  *Id.*  The County agrees with plaintiff's description of the punishment imposed, but not with his description of the transgression.  Rather, the County avers that Foxwell and Niblett were suspended only for misuse of a County vehicle, making the comparison to Allen's transgression inapt.  Memo at 17.

On February 4, 2000, Elvin Thomas received a phone call from a concerned citizen.  *See* Suspension Memorandum at 1.  The citizen reported that two County employees had used a County truck to deliver "a fuel oil tank in the Linkwood area."  *Id.*  The citizen identified the vehicle as Unit No. 203 and informed Thomas that the delivery was to be made to "Bonnie Lane,

---

F.3d 404, 420 (4th Cir. 2006); *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988) (noting that "the Commission's findings are not sufficiently probative to create a genuine issue of material fact").

[8] The record does not indicate whether Allen was deposed.  In any event, the parties have not submitted excerpts from Allen's deposition.

Beaver Neck Village trailer park." *Id.* Thomas was able to determine that the employees in the truck were Scott Foxwell and Levin "Tommy" Niblett. *Id.*

When Foxwell and Niblett returned to the Highway Department Shop, "both men were called in and asked" if they had delivered a fuel oil tank to the Linkwood area; both answered no. *Id.* They were also asked if they delivered a fuel oil tank to Bonnie Lane; both denied it. *Id.* However, after Thomas called the Sheriff's Department to request assistance in investigating the matter, Niblett confessed. *Id.* He explained to Thomas that he and Foxwell had removed a fuel tank from a residence that was being torn down and had transported the tank to the residence of Niblett's father. *Id.*

At Niblett's deposition, he explained that he had asked David Wheatley, the man demolishing the house, if he could have the tank, and Wheatley responded affirmatively. Deposition of Levin Niblett ("Niblett Dep.," ECF 55-28) at 34–35. Niblett received no money or recompense for either removing or delivering the fuel tank. *Id.* at 35.

As a result of the incident, Thomas suspended Foxwell and Niblett for three days, without pay. Suspension Memorandum at 1; *see* Niblett Dep. at 35. Niblett testified that it was his understanding that he was suspended for using the County truck. Niblett Dep. at 35; *see also* Deposition of Becky Dennis ("Dennis Dep.," ECF 55-29) at 203–4.

### 2. "Horseplay" Incident

Allen alleged in his First Affidavit that in or around 2000, several Caucasian employees "sexually assaulted an African American employee of the County by forcibly sodomizing him by attempting to force a corn cob into his rectum . . . ." First Affidavit of Floyd Allen ("Allen Aff. 1"), Ex E. to ECF 34-1 ¶ 4. He also asserted: "This incident has never been investigated and the

individuals involved have not been punished for these egregious acts against an African-American coworker." *Id.* But, in his response to defendant's Motion for Sanctions, Allen stated: "There is a typographical error and mistake contained in the filings. . . . there is an error in paragraph 4 of the affidavit where Mr. Allen refers to the victim of this assault as an 'African American.' This inconsistency was an oversight in editing and the wording of the Motion . . . [T]he perceived victim was a Caucasian employee." ECF 38 at 9–10 n.4; *see* ECF 37. In Allen's Opposition, he identified the alleged victim as Roads employee Ryan Horsman.[9] Opp. at 14.

The County vehemently denies that any sexual assault took place. It maintains that the incident to which plaintiff referred consisted only of "'horseplay' among Roads employees who found themselves with too much time on their hands." Memo at 18. Further, in its Reply, the County said: "Allen's slanderous falsehoods are dredged from his initial papers, at a time when he (and his counsel) seemingly believed that he might have been able to 'shakedown' Dorchester County for money." Reply at 6.

In or around 2000, an incident involving a physical altercation came to Phillips' attention. Phillips Dep. at 68. The incident involved highway workers Ryan Horsman, Kenny Plumber, Mark Elliott, and Daniel Insley. *Id* at 69. Phillips testified that Thomas received a phone call from an unknown party alleging that Roads employees were roughhousing on the job. Phillips Dep. at 71–72. Thomas asked Phillips to investigate and told him that one of the allegations in the phone call was that a sexual assault had occurred. *Id.* at 73. When Phillips arrived at the scene, he questioned the parties who were present and determined that the alleged sexual assault "didn't happen." *Id.* at 72; *see id.* at 69–75. Rather, two employees "got horsing around and got roughhousing. . . . It got out of hand because they got rough with each other, but other than that,

_____

[9] Allen spells Horsman's last name "Horseman." *See* Opp. at 14.

that was it." *Id.* at 69. Phillips repeated several times throughout his deposition that no sexual assault ever occurred. *See id. at* 72–74.

The County also submitted an affidavit from Ryan Horsman, the alleged victim of the alleged assault. According to Horsman, the fight began when Horsman, "as a joke," picked dried corncobs off the ground and threw them at Plummer. Affidavit of Ryan Horsman ("Horsman Aff.," ECF 55-22) ¶ 4. Plummer and the others reciprocated by throwing corncobs back at Horsman. *Id.* Horsman, who described the incident as "horseplay," further explained that Bruce Mitchell chased him and "tried to wrestle [him] to the ground." *Id.* At that point, Insley broke up the altercation and pulled Horsman away. *Id.* According to Horsman, "[t]his was the extent of the occurrence. It was in fun and all participants were joking the entire time. There was no 'sexual assault' or 'attempted sexual assault.' There was no complaint by me or anyone else and no one was disciplined." *Id.* ¶ 5.

Insley and Plummer also submitted affidavits in which they confirmed the substance of Horsman's recollection. *See* ECF 55-23; ECF 55-24. Both affiants swore "categorically" that "no such event ever occurred" and stated that they regarded Allen's allegations to be "at worst, perjury, and at best, vile slander." ECF 55-23 ¶¶ 2–3; ECF 55-24 ¶¶ 2–3.

### 3. "Swan Harbor" Incident

Allen asserted that in or around 2001, "several Caucasian employees of Dorchester County, including, but not limited to Mark Elliot and Tommy Niblett, received money for County dirt/ditch spoil for delivery to County resident and land owners." Allen Aff. 1 ¶ 1. Allen expanded upon these allegations in his Opposition, Opp. at 8:

> The evidence uncovered during discovery demonstrates that money did, in fact, change hands and the white County employees were taking the more valuable

"County dirt" from that project. Most importantly, there is evidence that County officials knew full well what was happening and that they instead turned a blind eye to this misconduct, at least until an African-American was so accused.

Allen estimated that the value of dirt misappropriated by County employees in the Swan Harbor incident was between $1,820 and $4,500. *Id.* at 13.

Defendant agrees with some of Allen's allegations, confirming that five drivers admitted to delivering dirt to private residences. *See* Memo at 19. However, the County disagrees in other key respects. Contrary to Allen's representation that the perpetrators were Caucasian, the County claims that two of the five employees involved in the incident are African-American. Memo at 20. The County also claims that only one of the employees, Niblett, received money; that he only received $30; and that no one who later prescribed Allen's punishment was aware that Niblett had received money for dirt. *Id.*

In November 2001, Newcomb received a call from a constituent, Rufus Todd, who requested that County dirt or ditch spoil be delivered to him "to fill in a little place at the church yard." Newcomb Dep. at 24. Todd noted that he had seen dirt being hauled in County trucks and wanted to know how he could have some delivered to the church. *Id.* at 29–30. Newcomb then contacted Baynard to notify her of Todd's request and to ask that she convey the message to Thomas. *See id.* at 28–31. Although Newcomb did not testify as to precisely what he told Baynard, she recalled that he advised "that there had been some delivery of dirt to a private residence in Swan Harbor." Baynard Dep. at 53. Baynard also recalled that Newcomb suggested that "some money exchanged hands" during the delivery. *Id.*

Baynard contacted Thomas, who was responsible for investigating such issues. *Id*. at 54. Baynard and Thomas informed the County Commissioners of the allegations at a commissioners meeting on November 13, 2001. *Id*. at 55–56. The minutes from that meeting state, ECF 60-4:

> Commissioner Newcomb advised the Commissioners that he has received numerous public complaints that County highway workers have delivered or sold dump truck loads of dirt to private residents. Ms. Baynard advised the Commissioners that she has brought these concerns to the attention of Elvin Thomas, Roads Administrator, and stated that he has talked with the drivers involved.

Thomas was tasked with investigating the incident, Baynard Dep. at 58–59, and asked Phillips for his assistance. Phillips Dep. at 46. Phillips discovered that a local resident, Pete Stanley, had asked some Roads employees to deliver dirt to his property in Swan Harbor. *Id*. at 39–40. Rather than delivering the dirt at Golden Hill Landfill for storage, as the employees had been directed to do, the employees delivered five loads of dirt to Stanley. *Id*. Stanley told Phillips that he had not paid for the dirt. *Id*. at 42.

After hearing Phillips' findings, Thomas met with the entire crew that had delivered the dirt to Stanley, *id*. at 46, and all five members eventually admitted their participation. *Id*. at 47; Baynard Aff. ¶ 13; Investigation Memo, ECF 55-9 at 1. Additionally, Niblett informed Thomas that he had received money for the dirt. Niblett Dep. at 22. Niblett testified at his deposition that he had received ten dollars per load, for three loads of dirt. *Id*. at 13. However, Baynard stated in her Affidavit that seven loads of dirt were delivered. Baynard Aff. ¶ 13. In any case, it is unclear from the record whether Thomas informed Baynard or anyone else that Niblett admitted to the receipt of money.

Baynard testified at her deposition that she had not been aware of Niblett's admission until she read Niblett's deposition testimony for the present matter. Baynard Dep. ¶ 81.

However, the Minutes from a commissioners meeting on November 20, 2001, reveal that there were "concerns that some of the employees had received minimal compensation." ECF 60-4.

Of the five suspended crew members, three were Caucasian and two were African-American. Baynard Aff ¶ 13. Thomas suspended Ryan Schwaab and Mark Elliott for five days, without pay, *id.*; suspended Niblett for six days, without pay, *id.*; and suspended Charles Moore and Keith Molock, both African-American, for three days, without pay. *Id.*; *see* Payroll Notices, ECF 55-10–13. Thus, the two African-American employees received the most lenient punishments. The morning after Thomas imposed the discipline, he convened a department-wide meeting, at which he informed all present that they could not sell dirt from a County Roads project. Phillips Dep. at 50–52.

On November 20, 2001, Thomas "informed the Commissioners that pursuant to requirements of Chapter 40 of local law, certain Highway employees will be suspended without pay for inappropriately depositing Highway fill dirt to a private residence." ECF 60-4. One of the commissioners posited that termination would be a more suitable punishment, but was rebuffed when Baynard advised him that, "subject to the provision of Chapter 40, [the employees] are under the exclusive direction and control of Mr. Thomas and noted that Mr. Thomas felt that, considering all circumstances, the sanctions were appropriate." *Id.*

4. "Fuel Theft" Incident

Allen alleged, both at the hearing on April 15, 2008, before the County Council and in his affidavit, that County employee Randy Willey "was alleged to have been stealing fuel from the County" and that the County took no action in response until they removed Willey from the fuel

truck six months later.  Allen Aff. 1 ¶ 3; ECF 55-7.  Based on Allen's allegations, the County investigated the matter and found no wrongdoing.  *See* Memo at 21–24.

Operators of the County fuel truck fill a fuel tank on the truck from a stationary fuel pump.  Phillips Dep. at 56–63.  They then drive the truck "out on the road" and use the fuel from the fuel tank to refuel County equipment.  *Id.*at 61–62.  On three occasions in 2008, when Willey operated the fuel truck, there were discrepancies between the amount of fuel he put into the fuel tank and the amount of fuel he dispensed into other County equipment.  *See* Phillips Dep. at 56, 61.  In other words, the fuel pump would show that it dispensed a certain amount of fuel into the fuel tank, but the fuel tank would show that it dispensed a lesser amount of fuel into other equipment.  *Id.*  The discrepancies averaged about 50 gallons per day.  *Id*. at 58.  Phillips testified that these discrepancies were not unique to Willey, but rather occurred regardless of who drove the fuel tank.  *Id.* at 57–59.  Phillips further testified, *id.* at 67: "Within the department, itself, we tried to find out where it was going, what was happening, everything else, and we couldn't. That's just it. We couldn't because other [drivers] had discrepancies, too."

Notably, the figures that showed the discrepancies were recorded by the fuel truck operators themselves.  *Id*. at 65–66.  As Phillips explained, the "[f]uel man has a sheet.  And he records what he pumps off the supply tank.  Then he turns around and he records every gallon he pumps off the fuel truck into each piece of equipment he pumps it into."  *Id.*

Phillips and Baynard suggested differing explanations for the discrepancies.  Phillips cited the age of the fuel pump and noted that the discrepancies diminished when new pumps were installed.  *Id.* at 62.  Baynard attributed the discrepancies to Willey's inexperience with the fuel truck.  Baynard Aff. ¶ 15.  In any event, "out of an abundance of caution, [Willey] was

prohibited from driving the truck," *id.*, as were other inexperienced drivers.  Phillips Dep. at 67.

This reduced, but did not eliminate, the discrepancies.  *Id.*

Additional facts will be included in the discussion.[10]

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.   "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Liberty Lobby*, 477 U. S. at 247-48 (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

---

[10]  Allen's Opposition mentions two other incidents of alleged sale of ditch spoil by County employees.  Because Allen provides only sparse details about these alleged incidents, I do not recount them there.  However, I address the allegations below.

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

## Discussion

In Count I, plaintiff alleges that the County disciplined him more severely than it did other Roads employees who committed similar infractions. Plaintiff alleges that this disparate treatment was the result of race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* *See* ECF 23 at 5.

Title VII prohibits an employer from, *inter alia*, discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Moreover, as amended by the Civil Rights Act of 1991, Title VII expressly provides for "mixed-motive" liability, stating: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or

national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e–2(m).

### 1. Employment Discrimination – Methods of Proof

In general, there are "two avenues" at trial by which a plaintiff may prove that an adverse employment action amounts to intentional employment discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc).  The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'"  *Burns v. AAF– McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n. 2 (4th Cir. 1989) (citation omitted).

Absent direct evidence of discrimination, the plaintiff at trial must first establish, by a preponderance of the evidence, a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).   To establish a prima facie case of

discrimination in the enforcement of employee disciplinary measures, an employee must show that "(1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993); *accord Lauture v. Saint Agnes Hosp.*, 429 Fed. App'x 300, 304–305 (4th Cir. 2011) (O'Connor, J., sitting by designation).

With regard to the second and third elements, a plaintiff can meet his burden by producing evidence of misconduct of other employees that is sufficiently similar to his own misconduct to permit a sound comparison between the discipline imposed in his case and in the prior cases. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981); *Laing v. Fed. Ex. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Although a "comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances," *Cook*, 988 F.2d at 511, a sufficient showing would include evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *accord Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010); *see also Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009).

Of import here, a comparison between a plaintiff and his comparator may be inapt unless the same decision-maker imposed the discipline in both cases. When the same person imposes

disparate discipline for similar offenses, "it is more likely than not the [disciplining supervisor], who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (emphasis in original).  By contrast, an inference of discrimination does not arise when a new decision-maker imposes harsher discipline than did the prior decision-maker.  This is because there are any number of innocent reasons that two different decision-makers would take different views on the proper punishment for similar incidents.  *See Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007) (" If different decision-makers are involved, employees are generally not similarly situated."); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that two employees were not similarly situated where they had different supervisors); *Timms v. Frank*, 953 F.2d 281, 287 (7th Cir. 1992) (reasoning that "it is difficult to say that the difference was more likely than not the result of intentional discrimination when two different decision-makers are involved"); *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 605–06 (8th Cir. 1983) (stating that evidence that one manager may be more lenient than another may explain the differential treatment that employees receive on a basis other than race).

If the plaintiff establishes a prima facie case, a presumption of illegal discrimination arises, and the burden of production shifts to the employer to "articulate a non-discriminatory reason for the difference in disciplinary enforcement." *Cook v. CSX Transp. Corp*., 988 F.2d at 507; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255.  In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out

of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983).[11]

When the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

To be sure, the relevance of the *McDonnell Douglas* scheme outside of the trial context is limited. The Fourth Circuit has admonished district courts at the summary judgment stage to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the

---

[11] It is a common practice to assume, without deciding, that the plaintiff has established a prima facie case in cases where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment. *See, e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319–20 (4th Cir. 2005); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp.2d 729, 736–37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). Further, the Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'" *Merritt*, supra, 601 F.3d at 294–95 (citation omitted). Nevertheless, the Court has referred to the *McDonald Douglas* proof scheme in analyzing the propriety of an award of summary judgment. *See*, *e.g.*, *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510 (4th Cir. 2006).

Here, plaintiff has not proffered any direct or indirect evidence of discrimination or racial animus. Accordingly, reference to the *McDonnell Douglas* framework is pertinent.

## 2. Employment Discrimination Under Title VII

Plaintiff was suspended for 30 days with pay; then, after the County concluded its investigation, he was suspended for another 30 days, this time without pay. He was also demoted from an MEO IV to an MEO III, with the prospect of reinstatement to MEO IV. Memo Ex. 1 ¶¶ 11, 17. However, he was not reinstated to that rank. Baynard Aff. ¶ 18.

As noted, Allen contends that his discipline was more severe than that meted out by the County to Caucasian employees who engaged in similar misconduct. Opp. at 6–7. In support of his claim, plaintiff cited four incidents of misconduct by Caucasian employees, and further alleged that the transgressors in those incidents either went unpunished or were punished more lightly. *Id.*

Defendant raises three arguments in response. First, defendant argues that plaintiff cannot establish that he is "similarly situated" to the transgressors in his first three comparators

because different decision-makers were involved in disciplining them than were involved in disciplining Allen. Memo at 28. Second, defendant argues that plaintiff cannot establish a prima facie case because "his misconduct was not of comparable seriousness to the misconduct of employees outside the protected class." *Id.* at 27. Third, defendant argues that, even if plaintiff can make out a prima facie case, "the County had a legitimate, non-discriminatory reason for disciplining Allen," and "Allen cannot prove that the County's reason for disciplining him . . . was a pretext for discrimination." *Id.*

As to the Swan Harbor, Fuel Tank, and Horseplay incidents, the County maintains that the transgressors in plaintiff's comparators were not "similarly situated" to Allen. Noting that all three incidents occurred prior to 2005, the County points out that the discipline imposed in the comparator cases was meted out by supervisors who were not involved in plaintiff's discipline. *See* Memo at 28–29; Reply at 11–13. Specifically, defendant notes that the employees in the Swan Harbor, Fuel Tank, and Horseplay incidents were disciplined solely by Elvin Thomas, in accordance with Chapter 40 of the County Code, whereas plaintiff was disciplined by the County Council. *See* Memo at 29 ("[F]or all events predating July 1, 2005, Thomas, as the County Roads Engineer, was the decision-maker for discipline for Roads employees; subsequent to that date, the County Council is the ultimate arbiter of discipline."). According to the County, this difference in disciplinary authority defeats plaintiff's prima facie case.

Plaintiff does not dispute the change in disciplinary authority. Instead, plaintiff points out that the County Council "always had the ability to control the County's department heads" and thus could remove Thomas at will. Opp. at 20 (citing Newcomb Dep. at 15–16). Plaintiff then asserts, without citation to any authority, that because "the Roads Engineer is hired by and

answers to the County Council . . . , the Council is the ultimate decision-maker in both instances." Opp. at 29. Plaintiff further argues that Baynard "was involved" in both the 2001 Swan Harbor investigation and the investigation into plaintiff's alleged misconduct, *id.* at 19, and that the County Council "was informed of the prior instances and should have known of the lenient discipline imposed on the Caucasian employees in 2001, prior to making its decision on Plaintiff's disciplinary matter." *Id.* at 21. Finally, plaintiff argues that the Supreme Court's recent decision in *Staub v. Proctor Hospital*, ____ U.S. _____, 131 S. Ct. 1186 (2011), supports his claim. Opp. at 30.

Allen's argument that the County Council was the "ultimate decision-maker" in the three comparator incidents is untenable. As an initial matter, the County Council did not even exist as an entity until January 2002, *i.e. after* all three purported comparator incidents. *See* Baynard Aff. ¶ 7; County Regulations, ECF 55-20. Additionally, the undisputed evidence makes clear that the predecessor to the County Council, *i.e.*, the County Commissioners, had no authority to impose discipline on Roads employees. *See* Baynard Aff. ¶ 7. Rather, prior to 2005, the County Roads Engineer possessed the exclusive authority to punish Roads employees. Chapter 40 of the Dorchester County Code provides, in relevant part: "Every county employee engaged in the construction or maintenance of county roads or bridges shall be under the *exclusive* jurisdiction and control of the County Roads Engineer . . . ." *Id.* § 40-7. Pursuant to Chapter 40, the County Council did not have decision-making authority at the time of the Swan Harbor, Fuel Tank, and Horseplay incidents. *See* Phillips Dep. at 47 ("[Thomas] was the disciplinary action person. . . . It went through him.").

The undisputed facts also show that Chapter 40's vesting of power in the County Roads Engineer was fully implemented in practice. When Thomas reported to the commissioners the discipline he planned to impose for the Swan Harbor incident, at least one commissioner objected that the punishments were not harsh enough. *See* Opp. Ex. J, ECF 60-4 at 5 ("Commissioner Nichols expressed concerns that termination may be a more appropriate action."). However, he was rebuffed when "Ms. Baynard clarified for the Commissioners that because the employees were subject to the provisions of Chapter 40, they are under the exclusive direction and control of Mr. Thomas . . . ." Executive Session Minutes, ECF 60-4 at 5.

Allen's contention that the County Council's power to fire Thomas made it the ultimate decision-maker in the comparator incidents is misguided. The relevant question is not whether the County had the power to fire Thomas for his purportedly lenient disciplinary decisions, but rather whether the County *actually made* those decisions. Only then can a factfinder reasonably infer that unlawful discrimination, and not an innocent disagreement between a past and present regime, is the reason for disparate disciplinary decisions. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) ("Put a different way, the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel . . . ."), *aff'd*, 553 U.S. 442 (2008).

For the same reason, plaintiff's argument that the County Council knew that the transgressors in the Swan Harbor incident had been punished leniently is a nonstarter. That the County Council knew that it was disciplining Allen more harshly than Thomas had disciplined the Swan Harbor transgressors does not make the County Council's actions suspect. If that were the case, then any new disciplinary regime would be required to impose the precise punishment

favored by its predecessor. Nor is it relevant that Baynard "was involved" in the investigation of the Swan Harbor incident. Her involvement in the investigation does not change the fact that she had no authority, prior to 2005, to impose a punishment.

Finally, plaintiff's reliance on *Staub v. Proctor Hospital* is unavailing. In *Staub*, the Supreme Court addressed the circumstances under which the Uniformed Services Employment and Reemployment Rights Act ("USERRA") permits holding an employer "liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." 131 S. Ct. at 1189. *Staub* might be relevant if plaintiff were attempting to hold the County vicariously liable for a discriminatory decision made by one of his direct supervisors, but it bears no relation to plaintiff's actual case.[12]

Because the decision-makers who imposed plaintiff's discipline differed from those who imposed discipline on Roads employees prior to 2005, the Roads employees disciplined prior to 2005 are not "similarly situated" to plaintiff. Accordingly, the Swan Harbor incident, the Fuel Tank incident, and the Horseplay incident are not viable comparators for plaintiff's claim.

In any event, all four of plaintiff's purported comparators—the Swan Harbor, Fuel Tank, Horseplay, and Fuel Theft incidents—fail for other reasons to support a prima facie case. *See Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."); *see also Moore v. City of Charlott*e, 754 F.2d 1100, 1107 (4th Cir. 1985)

---

[12] Plaintiff claims that *Staub* held that "an employer cannot skirt liability for discrimination solely because the comparative discipline was made by different decision-makers." Memo at 30. *Staub* had nothing to do with comparative discipline; rather, it addressed whether a single adverse employment action taken by an employee can be imputed to the employer. *See Staub*, 131 S. Ct. at 1194.

(directing courts to compare incidents "in light of the harm caused or threatened to the victim or society, and the culpability of the offender.").  I will discuss each incident, in turn.

The Swan Harbor incident is not a valid comparator because two of the five employees involved in that incident were African-American.  Indeed, they received more lenient punishments than did the three Caucasians who were involved.  *See* Baynard Aff. ¶ 13.

As noted, a plaintiff must proffer evidence that the "prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees *outside the protected class*." *Cook*, 988 F.2d at 511 (emphasis added).  If plaintiff's comparators are from the same protected class, then any discrepancy in discipline is not attributable to plaintiff's membership in that class. *See Booth v. Maryland*, 327 F.3d 377, 383 (4th Cir. 2003) (in a discrimination case under 42 U.S.C. § 1981, stating that it is "not possible to infer that any disparate discipline against Booth was motivated by racial discrimination because Booth's evidence demonstrated that both white and African-American employees were treated differently than Booth" (quotation marks and citation omitted)); *see also Delos Santos v. Potter*, 371 F. App'x 746, 748 (9th Cir. 2010) (denying disparate treatment claim under ADEA and Title VII because plaintiff's comparators were members of the same protected class as plaintiff); *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005) ("[B]ecause [comparator] is a member of the same protected class as [plaintiff], [plaintiff] is precluded from successfully arguing that she was unfairly discriminated against when Thompson chose to assign [comparator] as the head of the Health Clinic instead of her."); *Floyd v. U.S. Dep't of Homeland Sec.*, Civ No. RDB-09-0735, 2009 WL 3614830 (D. Md. Oct. 27, 2009) ("A plaintiff cannot establish a claim of disparate treatment by referencing a comparator of the same protected class.").

Rather than provide a substantive argument about why the involvement of the two African-American employees in the comparator incident does not defeat plaintiff's claim, plaintiff simply ignores the issue. In his Opposition, plaintiff refers repeatedly to the transgressors in the Swan Harbor incident as "the Caucasian County employees" and the "Caucasian employees," without any mention of the two African-American employees who were also involved. *See* Opp at 2–3, 7–9, 26. The undisputed facts reveal that "both white and African-American employees were treated differently than [Plaintiff]." *Booth*, 327 F.3d at 383. Accordingly, it is "not possible to infer that any disparate discipline against [Allen] was motivated by racial discrimination." *Id.* (quotation marks and citation omitted).

The Fuel Tank incident is not a viable comparator because the gravity of the offense is too dissimilar from that which Allen allegedly committed. As shown, the Fuel Tank incident involved an employee, Niblett, using a County vehicle to transport a privately owned fuel tank to his father's house. *See* ECF 55-14; Niblett Dep. at 35. Plaintiff asserts in his Opposition that Niblett stole the fuel tank from the County. *See* Opp. at 13, 27. But, the only evidence on the record is to the contrary; Niblett used a County vehicle to make a delivery to his father; he did not steal or sell County property. *See* ECF 55-14; Niblett Dep. at 34–36. *See Mackey v. Shalala*, 360 F.3d 463, 470 (4th Cir. 2004). ("An employee's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case."). In contrast, the County found that Allen repeatedly misappropriated County property and sold it for a profit of approximately $1,640. Thus, any comparison between the two incidents is unavailing.

With regard to the Horseplay incident, plaintiff's allegation that a Roads employee was sexually assaulted by several other employees is entirely devoid of support in the record and, in

fact, is contradicted throughout the record. It cannot serve as a valid comparator because the undisputed facts show that the incident never happened. As noted, Allen initially stated that the victim of the alleged assault was African-American and that the purported attackers were Caucasian. Allen Aff. 1 ¶ 4. Although plaintiff originally attributed the incident to racial bias, it turned out that the person identified as the alleged victim is actually Caucasian. *See* ECF 38 at 9–10 n.4.[13] Moreover, the alleged victim is not a victim; both he and the alleged perpetrators have submitted affidavits categorically denying that any sexual assault ever took place. *See* Affidavit of Ryan Horsman (ECF 55-22) ¶¶ 2–5; Affidavit of Daniel Insley (ECF 55-23) ¶¶ 2–6; Affidavit of Kenneth Plummer (ECF 55-24) ¶¶ 2–6.

To be sure, plaintiff claims that Phillips' deposition testimony proved that the incident occurred. *See* Opp. at 15. But, Phillips' testimony actually confirmed that no sexual assault occurred. Phillips testified that Thomas received a phone call from an unknown party alleging that Roads employees were roughhousing on the job. Phillips Dep. at 71–72. Thomas asked Phillips to investigate. When Phillips arrived at the scene, he questioned the persons who were present and determined that the alleged sexual assault "didn't happen." *Id.* at 72; *see id.* at 69–75. Rather, two employees "got horsing around and got roughhousing. . . . It got out of hand because they got rough with each other, but other than that, that was it." *Id.* at 69. Phillips repeated several times throughout his deposition that no sexual assault ever occurred. *See id. at* 72–74.

---

[13] In Allen's response to Motion for Sanctions (ECF 38), Allen stated: "There is a typographical error and mistake contained in the filings. . . . there is an error in paragraph 4 of the affidavit where Mr. Allen refers to the victim of this assault as an 'African American.'" ECF 38 at 9–10 n.4.

Although plaintiff states in his Opposition that he "witnessed [the] assault" himself, *see* Opp. at 15, no one placed Allen at the scene. *See, e.g.*, Phillips Dep. at 69. Moreover, Allen has produced no evidence in affidavits, exhibits, or deposition testimony to support his assertion that he was present during the Horseplay incident or otherwise has personal knowledge that it occurred. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . ."). Thus, there is no competent evidence that a sexual assault occurred, for which discipline was not imposed. And, in light of the substantial evidence to the contrary, Allen's unsworn assertion in his legal brief is insufficient to establish a material fact for summary judgment purposes. *See, e.g.*, *EEOC v. CTI Global Sols., Inc.*, 815 F. Supp. 2d 897, 914 (D. Md. 2011) (To avoid summary judgment in the movant's favor, the non-moving party 'must present *evidentiary matter* showing that there is a genuine issue of material fact that is worth bringing to trial.' Defendant fails to present such evidence here, instead only presenting conclusory statements in its brief to support these assertions.") (emphasis in original) (internal citations omitted).

In light of the evidence on the record, no reasonable jury could conclude that the alleged sexual assault occurred. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Accordingly, plaintiff may not rely on this incident as a valid comparator.

With respect to the Fuel Tank incident, Allen alleges that fellow employee Randy Willey "was alleged to have been stealing fuel from the County." Allen Aff. 1 ¶ 3. He argues that the

County did not investigate the incident and that it did not impose any discipline against Willey. Opp. at 14. However, contrary to plaintiff's assertions, the evidence in the record compels the conclusion that the County investigated the matter and determined that no wrongdoing had occurred.

Willey was cleared of wrongdoing. As Phillips made clear, the discrepancies between the fuel pump and the fuel tank were not unique to Willey. Phillips explained: "Every time, whoever gets on there, they won't be exact. It will not be exact gallons or anything like that. It will always be discrepancy." Phillips Dep. at 57. Phillips continued: "it wasn't just Randy Willey that the gallons were missing on. . . . It was not just Randy Willey. It was other ones. That's why we couldn't pin down where it was at." *Id.* at 59. Moreover, rather than attributing the discrepancy to employee misconduct, Phillips surmised that the discrepancies were caused by the age of the fuel pump and noted that the discrepancies decreases when new pumps were installed. *Id.* at 62. Similarly, Baynard stated in her affidavit that the County "looked into the alleged taking of diesel fuel by another employee" and attributed the discrepancies to Willey's inexperience with the fuel truck. Baynard Aff. ¶ 15.

Additionally, the discrepancies were recorded by the fuel truck operators themselves. *Id.* at 65–66. As defendant points out, an employee seeking to steal fuel from the fuel truck would not implicate himself by recording the discrepancies that his theft created. *See* Reply at 5–6.[14]

---

[14] The County also proffered evidence that a former County employee, John Johnson, was "the only County employee ever" to be charged with stealing County fuel. Dennis Aff. ¶ 5. Johnson was charged criminally with theft, suspended without pay, and terminated upon conviction. *Id.*; *see* Johnson Memo ECF 55-25. However, the County has not provided evidence of Johnson's race. Accordingly, the Johnson incident does not shed any light on the comparative treatment of plaintiff.

Once again, plaintiff relies on conjecture; he has not proffered any evidence that a theft of fuel occurred or that the County refused to investigate the fuel discrepancies. *See Mackey*, 360 F.3d at 470 ("An employee's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case."). He does not allege any personal knowledge of theft or any other basis on which a factfinder could disbelieve the County's evidence. Accordingly, no reasonable jury could conclude that the Fuel Theft incident was comparable to Allen's misconduct.

As noted, Allen's Opposition mentions two other incidents in which Roads employees allegedly sold ditch spoil. Specifically, Allen states, Opp. at 27: "Mr. Allen has presented evidence that Highway Division Manager, Roy Mills, a Caucasian employee, and James Travers, another Caucasian employee had engaged in the act of selling ditch spoil and that they have done so with impunity." These allegations were not included in the Complaint. *See* ECF 23. In any event, they are not supported by the record.

To be sure, the burden is on the moving party to establish its entitlement to summary judgment. But, "the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Liberty Lobby*, *supra*, 477 U.S. at 256. If the nonmoving party's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Holland*, *supra*, 487 F.3d at 213 (quoting *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted)). Moreover, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Liberty Lobby*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Accordingly, in considering a summary judgment motion, a judge must determine "'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871) (emphasis in *Munson*). If the evidence on the record would not support a verdict for the nonmoving party, it is "the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" and to grant summary judgment for the moving party. *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1993) (quotation marks and citations omitted); *see also Matsushita*, *supra*, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotation marks omitted)).

Allen has produced only sparse evidence related to his allegations about Travers and Mills. As to Travers, Allen's only citation is to a rebuttal statement he submitted to the EEOC in February 2009, in which he stated that Travers sold dirt throughout 2006 and 2007. *See* Opp. at 27; EEOC Letter, Opp. Ex. C. As to Mills, Allen cited to the same document and to oral statements he made at the grievance hearing held on September 29, 2009, before the County Council. *See* Opp. at 10. Although Allen does not cite to it, Allen's First Affidavit contains the following statement: "Since I began working for the County, Roy Mills . . . and I sold County dirt/ditch spoil together or I delivered the ditch spoil at the direction of Mr. Mills . . . To my knowledge, Mr. Roy Mills has never been charged, investigated, reprimanded, suspended, or demoted for this conduct." Allen Aff. ¶ 2. At his deposition, Mills stated that he has never sold

ditch spoil or instructed anyone else to sell ditch spoil.  Deposition of Roy Mills ("Mills Dep.") at 28–29.

Upon consideration of Allen's exhibits, it is patently clear that there is not sufficient evidence relating to the two alleged incidents for a reasonable jury to return a verdict for Allen. Critically, the exhibits do not contain any evidence or allegation that the County was aware of the alleged misconduct of Travers or Mills at a time when it could act upon it.  An alleged infraction by a Caucasian employee is irrelevant unless the County knew about it and either failed to pursue it or failed to impose discipline comparable to that imposed on Allen.  The facts on the record do not allege the County learned of the incidents within a period temporally related to the incident,[15] nor do they suggest that Allen has personal knowledge of the County's awareness such that he could testify as to the matter.

Additionally, the exhibits do not provide information from which a jury could conclude that Travers or Mills were similarly situated to Allen or that the transgressions Allen alleges were comparable in seriousness to the acts that formed the basis of Allen's discipline.  Thus, there remains "an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, *supra*, 477 U.S. at 325; *see id.* at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

---

[15] Even if such knowledge need not be contemporaneous, it would be difficult to regard the matter as an appropriate comparator if the County only learned of the conduct long after it occurred.

In sum, the evidence on the record would not permit a reasonable jury to infer that Allen was disciplined more harshly than similarly situated Caucasian Roads employees. Accordingly, Allen's Title VII claims cannot survive summary judgment.

3. State Law Discrimination

Allen also alleges that the County acted in violation of Maryland's antidiscrimination laws. The Maryland Code (2009 Repl. Vol., 2011 Supp.), § 20-606 of the State Government Article provides, in relevant part:

(a) An employer may not:

(1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:

(i) the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

Because of this section's similarity in wording and substance to Title VII's antidiscrimination provision, Maryland courts interpreting § 20-606 (formerly Art. 49B, § 16 of the Maryland Annotated Code) have often found federal cases arising under Title VII to be persuasive authority. *See, e.g.*, *Taylor v. Giant of Maryland, LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766 (1990); *Md. Shipbuilding & Drydock Co., Inc. v. Md. Comm'n on Human Rel.*, 70 Md. App. 538, 545-50, 521 A.2d 1263 (1987); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013). And, Allen has not asserted any distinction between his federal and state claim. Accordingly, I apply the same standards to plaintiff's state law claim as I applied to his

federal law claim, and conclude that the State claim is also without merit. *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012) ("Plaintiff's state law racial discrimination claim duplicates his Title VII racial discrimination claim and fails for the same reasons.").

Because plaintiff has not adduced sufficient evidence to support a finding of discrimination under either state or federal law, I will grant summary judgment to defendant on Count I.

### 4. Equal Protection

In Count II of his Complaint, Allen lodges a claim against the County under 42 U.S.C. § 1983 for violation of "equal protection of the law." ECF 23 at 6. Specifically, Allen alleges that the County's "repeated failure to adequately investigate, equally charge, and fairly punish Caucasian employees for the same or similar violations committed by minority employees demonstrates an unlawful policy and custom implemented by Dorchester County government officials, which deprives minorities, particularly African Americans, of equal protection under the law." ECF 23 ¶ 28. Defendant argues that "the evidence proves that [Allen's] employer was not motivated to act against him by discriminatory intent." Memo at 30.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439; *see Plyler v. Doe*, 457 U.S. 202, 216 (1982). Nevertheless, "this does not mean that persons in different circumstances cannot be treated differently under the law. Rather, the essential command of the Equal Protection Clause has always been that the classification of persons which a law applies must be 'reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to

the object of the legislation.'" *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995) (quoting *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920)).

It is well established that the Equal Protection Clause of the Fourteenth Amendment affords "protection to employees who serve the government as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119–20 (1992). In particular, § 1983 establishes a cause of action against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Although "[t]he Equal Protection Clause was intended as a restriction on state *legislative* action," *Plyler*, 457 U.S. at 216 (emphasis added), state and local governments "do not escape the strictures of the Equal Protection Clause in their role as employers." *Engquist v Oregon Dept. of Agr.*, 553 U.S. 591, 597 (2008). Accordingly, "the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Id*. at 605.

A local government may be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Monell v. New York City Dept. of Soc.*

*Services,* 436 U.S. 658, 694 (1977); *see Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987). Moreover, "a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body . . . because even a single decision by such a body unquestionably constitutes an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Even a law that is facially neutral can violate the Equal Protection Clause when "its administration or enforcement effect[s] an unequal application by favoring one class of persons and disfavoring another." *Sylvia Dev. Corp.*, 48 F.3d at 818–19. Where a plaintiff alleges that a facially neutral law has been applied unequally to similarly situated individuals, there "is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8 (1944); *accord Washington v. Davis*, 426 U.S. 229, 239 (1976). "In short, where a classification does not appear on the face of a statute and is not officially stated as a reason for administrative action, the plaintiff has the burden of proving that the classification was actually utilized in the administrative action and that its use was intentional and purposeful." *Sylvia Dev. Corp.*, 48 F.3d at 820.

In sum, to state a claim under § 1983, a plaintiff must: (1) "allege the violation of a right secured by the Constitution and laws of the United States"; and (2) "show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, ____ U.S. ____, 132 S.Ct. 112 (2011); *Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988).

Plaintiff does not allege that an explicit racial classification appears in the County Code or any other relevant law. Thus, in order to prevail on his equal protection claim, Allen must

show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). For the reasons discussed in the context of Allen's Title VII claim, Allen has not offered any evidence to support a finding that he was disciplined differently than others with whom he is similarly situated. The comparators he offered are either dissimilar in severity, dissimilar in disciplinary authority, or otherwise unavailing.

Allen also alleges, in support of his equal protection claim, that he was "denied overtime opportunities during his probationary period" and that another African-American employee was not offered overtime on October 8 and 9, 2008. Opp. at 17. However, the only evidence Allen cites in support of these allegations is an audio recording of his own testimony before the County Council at the grievance hearing. There, Allen claimed that on one occasion, two Caucasian employees, Calvin Stacks and Kenny Steward, received overtime work that was not offered to Allen. And, he claimed that an African-American colleague, Thomas Cornish, did not get overtime on another occasion, although Allen did not assert that a Caucasian got overtime instead of Cornish. ECF 34-2 at 5:45–7:00.

The County denies that race played any role in the assignment of overtime. *See* Reply at 9. Mills, the County's Highway Division Manager, testified that he assigns overtime based on the equipment needed for the job and the employees' proximity to the worksite. Mills Dep. at 16–20. But, the parties have not submitted a deposition or an affidavit of Stacks, Steward, or Cornish.

Even assuming the truth of Allen's allegations that Mills gave preferential treatment to Caucasian employees on these two occasions, the County is entitled to summary judgment on this claim.

There is no legislative component to the claim as to overtime, so presumably Allen relies on an alleged custom or policy. A municipality may only be held vicariously liable for the discriminatory acts of its employees "when execution of a government's policy or custom . . . inflicts the injury." *Monell*, 436 U.S. at 694. A practice of discrimination by County employees only rises to the level of a "custom," such that it can be attributed to the County itself, if the "persistent and widespread practices of municipal officials . . . are so permanent and well-settled as to have the force of law." *Spell*, 824 F.2d at 1386 (quoting *Monell*, 436 U.S. at 691) (alterations and quotation marks omitted)); *see also Connick v. Thompson*, ____ U.S. ____, 131 S. Ct. 1350, 1359 (2011). In such a case, "the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387.

Allen's allegation that African-American employees did not receive overtime work on two occasions falls woefully short of establishing a "persistent and widespread practice" of racial discrimination by the County that satisfies the "stringent" requirements for municipal liability under § 1983. *See Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994) ("The substantive requirements for proof of municipal liability are stringent."); *see also Carter v. Morris*, 164 F.3d 215, 220 (4th Cir. 1999); *Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995). In sum, Allen has not adduced sufficient evidence to permit a finding that the County violated the Equal Protection Clause of the

Fourteenth Amendment. Accordingly, I will grant summary judgment to defendant with respect to Count II.

### 5. Procedural Due Process

Pursuant to 42 U.S.C. § 1983, Allen alleges that the County's investigation of his alleged misconduct violated his right to procedural due process under the Fourteenth Amendment to the United States Constitution. *See* ECF 23 at 7–8. In its Memo, the County proffers several reasons why "Allen's claim of a denial of due process is without any merit." Memo at 32. Specifically, the County argues that Allen had no entitlement to continued employment, that he was not deprived of his employment, and that he was afforded "more than ample procedural due process to counter the charge against him." Memo at 34–35.

In his opposition, Allen does not respond to any of defendant's arguments and does not address his procedural due process claim in any way. Accordingly, he has abandoned his claim of a procedural due process violation. *See Mentch v. Eastern Savings Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) ("[Plaintiff] abandoned her harassment claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief."); *see also Ferdinand–Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010).

Even if this claim were not abandoned, it lacks merit. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). In order to state a claim for a due process

violation, a plaintiff's allegations must implicate a protected liberty or property interest. *Guerra v. Scruggs*, 942 F.2d 270, 277 (4th Cir. 1991); *see, e.g.*, *Mallette v. Arlington County Empls. Supp. Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996) ("[Plaintiff] is entitled to procedural due process only if she holds a constitutionally protected property interest . . . ."). The "standard analysis" under the Due Process Clause is a *procedural* due process inquiry that asks "whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, ___ U.S. ___, 131 S. Ct. 859, 861 (2011).

Courts have long recognized that "the fundamental requisite of due process of law is [notice and] the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914); *see LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("[T]he core of due process is the right to notice and a meaningful opportunity to be heard."); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (observing that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"). Yet "'due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Once it is determined that due process applies, the question remains what process is due."); *see Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 484 (1988).

In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985), the Supreme Court reiterated that "'[t]he root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (emphasis in original). "This principle requires 'some kind of a hearing' prior to the discharge [or punishment] of an employee who has a constitutionally protected property interest in his employment." *Loudermill*, 470 U.S. at 542 (citation omitted); *see Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972).[16]

Allen had notice and an opportunity to be heard before his final discipline was determined. Based on the record, in which plaintiff was afforded a hearing at which he addressed the County Council before final sanctions were imposed, there is no basis for the claim of a denial of procedural due process. Therefore, I will grant summary judgment to defendant with respect to Count III.

## CONCLUSION

For the foregoing reasons, summary judgment will be granted in favor of defendant. A separate Order, consistent with this Memorandum, follows.


Date: September 30, 2013                          _____/s/_____
                                                  Ellen L. Hollander
                                                  United States District Judge

---

[16] Whether a public employee has "a property interest in his employment is determined by reference to state law." *Carroll v. City of Westminster*, 52 F. Supp. 2d 546, 561 (D. Md. 1999), *aff'd*, 233 F.3d 208 (4th Cir. 2000). "Generally," under Maryland law, "'a non-tenured State or local government employee who serves "at will" is not regarded as having a property right in continued public employment.'" *Higginbotham v. Pub. Serv. Comm'n*, 171 Md. App. 254, 267, 909 A.2d 1087, 1094 (2006) (citation omitted). In any event, Allen was not discharged by the County.